IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

| | | |
|---|---|---|
| NORA DENT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. <u>07-2238 Ma/P</u> |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER | ) | |
| OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

_____

## REPORT AND RECOMMENDATION

_____

Plaintiff Nora Dent appeals from a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 <u>et seq.</u> and for Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 <u>et seq</u>. The appeal was referred to the United States Magistrate Judge for a report and recommendation. Based on the entire record in this case, the court proposes the following findings of fact and conclusions of law, and recommends that the Commissioner's decision be remanded for further proceedings consistent with this report and recommendation.

## I. PROPOSED FINDINGS OF FACT

Dent filed her application for Supplemental Security Income

and disability insurance benefits on May 21, 2004. (R. at 58-60).[1]
She alleged a disability onset date of April 1, 2004, citing
congestive heart failure, carpal tunnel syndrome, and human
immunodeficiency virus ("HIV") infection. (R. at 63). The Social
Security Administration denied her application initially on March
21, 2005, (R. at 44-46), and upon reconsideration on August 3,
2005. (R. at 51-52). At her request, a hearing was held before
Administrative Law Judge ("ALJ") Anthony Fava on April 3, 2006. (R.
at 560-76). The ALJ issued a written decision on August 24, 2006,
denying Dent's claims. (R. at 11-26). After the Appeals Council
denied her request for review on January 31, 2007, (R. at 5-8),
Dent filed the instant appeal in the Western District of Tennessee
on April 4, 2007.

## A.   Medical History

Dent was born on November 17, 1966, and claims to have been
disabled since April 1, 2004, due to congestive heart failure,
carpal tunnel syndrome, and HIV infection. (R. at 63, 69). She is
5'5" tall and weighs approximately 430 pounds. (R. at 62). At the
time of her hearing, Dent was thirty-nine years old. (R. at 563).
She graduated from high school, attended one year of community
college, and received a vocational certificate in the field of
medical office specialist. (R. at 67, 563). Dent last worked as

---

[1]Dent had also filed claims for disability benefits in 1995 and
2000, which were denied. (R. at 35, 40, 69-70).

a hospital admissions clerk from November of 2002 until January of 2004. (R. at 63). She was terminated from that job due to an incident of insubordination unrelated to her alleged impairments. (R. at 565-66). She has not worked since that time. (R. at 565). Dent is single and has three children. (R. at 50, 55, 297). At the time of the hearing, she was living with her daughter and granddaughter. (R. at 50, 55). When she applied for disability benefits, Dent was taking the following medications: Aspirin, Claritin, Emtriva, Imdur, Lasix, Lisinopril, Norvasc, Norvir, Potassium, Reyataz, and Ziagen. (R. at 66).

Dent was diagnosed with HIV and hepatitis C when she tried to donate blood in February of 2003. (R. at 259). Dr. David L. George completed an Infectious Disease Consultation Report for Dent on May 14, 2003. (R. at 259-61). The report stated that Dent had no history of opportunistic infections, neoplasm, other sexually transmitted diseases, blood transfusion, tattoos, or intravenous drug use. (R. at 260). Dent stated that she had been sexually exposed to a man who was HIV positive about nine years ago, but that she had been tested multiple times since then, including as recently as one year ago, and that the results were negative each time. (Id.). She did not recall a history of hepatitis. (Id.).

Dent had been taking Bactrim Double Strength and Rifabutin 150 mg for prophylaxis of pneumocystis and mycobacterium avium complex. (R. at 260). Dent's viral load was 141,800 and her CD4 lymphocyte

count was fifty-four. (Id.). Dent had not taken any anti-retroviral medications yet, but she reported some fatigue after taking her current HIV medications. (Id.). Additionally, Dent had suffered from headaches over the past year that were relieved by over the counter medications. (Id.). She experienced some photophobia associated with her headaches. (Id.). She denied having cough, shortness of breath, abdominal pain, nausea, vomiting, diarrhea, or sore throat. (Id.). She stated that she had lost some weight after starting her medication. (Id.).

Dent's medical history included a history of hypertension, but she had been doing satisfactorily without her medication for the past five years. (R. at 260). She had recently started working at Delta Hospital as an admissions clerk. (Id.). At the examination, Dent weighed approximately 400 pounds, and her blood pressure was 122/78. (Id.). Her systems were generally normal, and her abdomen was soft with mild to moderate tenderness in the epigastric area and right upper quadrant. (Id.).

Dr. George's impressions and recommendations were as follows:

> Ms. Dent has newly diagnosed HIV infection. Based upon her parameters, she appears to have had this infection for some time which is somewhat in conflict with her history of having had multiple negative tests including as recently as one year ago. Alternatively it is possible but less likely that she has had infection within the last six months or so and is having a temporary adverse blip in her virologic parameters which may improve to some degree spontaneously. We will recheck her HIV viral load and CD4 lymphocyte count today. I note she has not had any symptoms to suggest a seroconversion syndrome. In view of her high viral load

-4-

and low CD4 lymphocyte count, we will go ahead and begin therapy with Kaletra three pills twice daily and trizivir one pill twice a day. She has been counseled about the abaclovir hypersensitivity information and given literature about this. She has been counseled at length about side effect management, compliance, and the need to address intolerance promptly so as to avoid inconsistent compliance and the development of resistance. We will go ahead and check some additional baseline parameters including a CBC, chemistry profile, and serologies for syphilis and hepatitis B. In view of her headaches, we will check a serum cryptococcal antigen, and she may possibly require more evaluation for this. Her hepatitis C is important; however, in view of her HIV parameters, that must be addressed first. In the meantime, we will go ahead and check a hepatitis C genotype and a hepatitis C viral load. Right upper quadrant pain is noteworthy; however, she has had a recent ultrasound in Dr. Harris' office which presumably did not indicate an acute gallbladder problem. Low-grade fever is noted, and we will extend her workup quickly if this increases. I will change her Bactrim Double Strength to every Monday, Wednesday, and Friday. She has some fatigue which may be associated with the rifabutin, so we will discontinue this. We will see what her repeat CD4 lymphocyte count is and consider azithromycin for MAC prophylaxis if she remains low. Her large size is also noteworthy, and we may need to check drug levels to make sure she is getting therapeutic levels of her HIV medicine. We will plan to see her again in three weeks and see how she is coming along.

(R. at 261-62).

Dr. George continued treating Dent's HIV. (R. at 474-82). On February 3, 2004, Dr. George sent a letter to Dr. Ken Harris, Dent's treating physician at Metro Memphis Medical Specialists ("MMMS"), stating that Dent's HIV infection was responding well to treatment, with her CD4 lymphocyte count increasing from 54 to 258 and her HIV viral load becoming undetectable. (R. at 212). Blood tests performed from April 13, 2004 to March 20, 2006, showed that

generally Dent's mean platelet volume was high, her white blood cell count was low, and her CD4 lymphocyte count was low. (R. at 141, 143, 146-48, 188, 196-98, 209-11, 475, 482). Dr. George also treated Dent for a number of other complaints, including headaches, overactive bladder, numbness in her feet and legs, myalgia, shortness of breath, mouth and throat pain, body aches, abdominal pain, dysuria, parasthesia, and swelling in her knees. (R. at 186, 193, 199, 205, 213). Dr. George also discussed gastroplasty with Dent on May 3, 2004, and August 24, 2004, but she decided against having the surgery because she was "scared and paranoid" about the procedure. (R. at 199, 205).

Dent's medical records showed that she was treated by Dr. Darrell Croft for pain in her left heel. (R. at 468-72). Dent first sought treatment from Dr. Croft on November 2, 2001. (R. at 468). Her heel was tender upon palpation plantarly and posteriorly, and an x-ray showed significant degenerative changes with mild infer and posterior calcaneal spurring, although there was no evidence of fracture. (Id.). Additionally, there was moderate pes valgus planus deformity. (Id.). Dr. Croft gave Dent a Bledsoe boot and pain medication, which provided her some relief. (R. at 468-69). Dent continued to experience improvement until her boot broke in January of 2004. (R. at 470). Dr. Croft replaced the boot and injected Decadron into her heel. (Id.). On March 24, 2004, Dent was fitted with an orthotic appliance. (R. at 472).

The record does not show that Dent sought treatment for her heel again.

Dent was also admitted to the Saint Francis Hospital emergency room on a number of occasions. On April 14, 2004, Dent was admitted to Saint Francis Hospital for progressive shortness of breath, dyspnea, paroxysmal nocturnal dyspnea, and three pillow orthopnea over the preceding week. (R. at 381-82). She also complained of acute chest pain that radiated to her back and felt like a squeezing sensation. (R. at 382). X-rays of Dent's chest were consistent with congestive heart failure, and she was admitted for further treatment and evaluation. (Id.).

On April 15, 2004, Dr. Aftab A. Shaikh performed an echocardiogram on Dent. (R. at 389). His report stated that Dent was experiencing congestive heart failure and shortness of breath with chest pain. (Id.). The report also stated that because Dent weighed over 450 pounds, it was difficult to do a complete study. (Id.). Dr. Shaikh estimated that Dent's pulmonary artery pressure was slightly elevated to 33 millimeters. (Id.). Her right ventricle and right atrium were slightly enlarged, and there was a slight thickening of the aortic valve and no aortic stenosis. (R. at 389-90). Dr. Shaikh also found that Dent's left ventricular cavity was normally sized and had normal contractibility. (R. at 390). Finally, there was no pericardial effusion present. (Id.).

Also on April 15, Dr. Terry L. Thompson performed a

neuromuscular perfusion lung scan to assess Dent's shortness of breath. (R. at 393). Dr. Thompson found that there was symmetrical distribution of radioactivity with no focal defects, and he found that there was a low probability of pulmonary embolization. (Id.). X-rays were also taken of Dent's chest to check for placement of a peripherally inserted central catheter ("PICC"). (R. at 394). Dr. Stefan J. Cowles found that the PICC was properly placed with the tip in Dent's superior vena cava and that her heart was borderline enlarged with prominence of central pulmonary venous structures as a result of probable pulmonary venous congestive changes. (Id.). On April 16, 2004, chest x-rays were taken again because Dent continued to complain of shortness of breath. (R. at 395). The x-rays were negative, and Dr. Donald D. Owens found that Dent's heart, lungs, mediastinum, and bony thorax were normal. (Id.). On April 17, Dr. Shaikh conducted a Dobutamine stress test. (R. at 388). Dent's resting electrocardiogram ("EKG") showed her sinus rhythm was eighty-four, her PR interval was 0.16, her QRS interval was 0.06, and the axis was normal. (Id.). Dr. Shaikh found that Dent's EKG overall was normal. (Id.). Dent's heart rate and blood pressure responses were also normal. (Id.). The same day, Dr. David Simmons conducted a stress echocardiogram on Dent. (R. at 387). His report stated that Dent's baseline EKG showed normal left ventricular systolic function and segmental wall motion with an

-8-

overall ejection fraction estimated at 60%. (Id.). Additionally, the stress echocardiogram showed normal contraction and segmental wall motion abnormalities but no left ventricular enlargement. (Id.). He concluded that the results were consistent with a negative stress echocardiogram for evidence of myocardial ischemia or left ventricular dysfunction. (Id.).

The Discharge Summary completed by Dr. Kenneth Harris on April 19, 2004, stated that Dent had been diagnosed with decompensated congestive heart failure, resolved; secondary pulmonary hypertension; hypertension, system; acute coronary syndrome; HIV, AIDS; and sleep apnea. (R. at 381-82). At the time of discharge, her condition was "stable and much improved." (Id.). Dr. Harris restricted Dent's diet to 2 grams of sodium and Step 1 of the American Heart Association Diet. (Id.). At discharge, Dent was no longer experiencing chest pain. (Id.). Dent was able to walk over 100 feet without any evidence of pre- or post-ambulation desaturation. (Id.).

On May 25, 2004, Dent went to the emergency room seeking treatment for neck pain, numbness in her arms, and headache. (R. at 373). The triage notes stated that Dent reported her level of pain as being six out of ten and that her doctor had told her that she had a neck fracture. (R. at 376-77). Dr. Fred Hamilton performed a computed axial tomography ("CT") exam of the cervical spine. (R. at 370). He found that the C2, C3, and C4 vertebral

bodies appeared normal, but the C5 and C6 vertebral bodies were very poorly visualized due to Dent's large size. (Id.). He also found that the visualized portion of the cervical spine showed a normal spinal canal with no evidence of fracture or neural canal encroachment. (Id.). Dent was prescribed Dilaudid 20 mg and Phenergan 25 mg. (R. at 375).

On December 6, 2004, Dent arrived at the emergency room complaining of left knee pain. (R. at 364). The triage notes stated that Dent appeared to be in no apparent distress and was comfortable. (R. at 366). Additionally, the range of motion was intact in all of her extremities. (Id.). She was prescribed Toradol 60 mg. (R. at 365). On July 29, 2005, Dent sought emergency care for ongoing pain in her knees and legs due to arthritis. (R. at 358, 431). Dent rated her pain level as being ten out of ten. (R. at 417). She was prescribed Percoset. (R. at 355).

Dent also sought emergency care on October 5, 2005, for abdominal pain, pain on the right side of her neck, numbness in her left arm and hand, and pain in both of her legs. (R. at 352). Dent rated her pain level as being ten out of ten. (Id.). The triage notes stated that no cardiovascular deficits were evident and that Dent was hyperventilating. (Id.). Dent was prescribed Percoset, Reglan 10 mg, and Zantac 150 mg. (R. at 432).

On October 26, 2005, Dr. George S. Flinn, Jr., performed an

ultrasound examination of Dent's abdomen, but Dent's size precluded an adequate examination. (R. at 318). On October 31, 2005, Dr. Harris took x-rays of Dent's chest for chest pain and HIV/AIDS. (R. at 408). He found borderline cardiac enlargement, bilateral diaphragm elevation associated with her large body habitus, no focal infiltrates, edema, or mass formation, but there was decreased lung volume. (Id.). Additionally, Dr. Harris performed a CT of Dent's chest. (R. at 316). He stated that the study was severely compromised due to starvation artifacts from Dent's large body habitus and motion artifacts. (Id.). He did find borderline cardiac enlargement without pericardial effusion evidence. (Id.). Further, there were no focal pulmonary infiltrates identified, and there was a small calcified granuloma present in the left lung base. (Id.). Dr. Harris' opinion was that the protocol was indeterminate, but there were no definite pulmonary emboli identified. (Id.).

On November 1, 2005, Dr. Raymond C. Jeffers completed Dent's history and physical. (R. at 402-03). Dent had arrived at the emergency room seeking treatment for chest pain and shortness of breath that had been ongoing for two to three weeks. (R. at 402, 423). She described the pain as an aching/pressure sensation over the anterior chest area with mild shortness of breath at times. (Id.). She had also developed a nonproductive cough and fever. (Id.). The triage notes stated that Dent's level of pain was eight

out of ten.  (R. at 342).  Additionally, the notes stated that Dent appeared uncomfortable, but her respiratory effort was even and unlabored and her respiratory pattern was normal.  (Id.).  The previous week, Dr. Harris had given Dent an antibiotic and cough medication that Dent said helped a little bit.  (R. at 402). Dent's EKG and cardiac blood tests were negative, and she was admitted for further evaluation and treatment.  (Id.).  A physical exam showed that she was not in respiratory distress, her chest was non-tender, and she had normal breathing sounds.  (R. at 424).  Dr. Jeffers noted that Dent was morbidly obese, her blood pressure was 120/80, and her chest was tender to palpation over the anterior areas without redness, mass, or lesion.  (R. at 403).  Her lung fields were clear bilaterally.  (Id.).  Dr. Jeffers' diagnostic impression was chest discomfort probably of noncardiac or pulmonary embolus etiology, most likely musculoskeletal possibly secondary to her coughing.  (Id.).  Dr. Jeffers also conducted a chest x-ray and found that Dent's heart was enlarged but her chest was otherwise normal.  (R. at 411).  The following day, Dr. Jeffers conducted a portable perfusion lung scan, which did not show any abnormalities. (R. at 412).  Dent was prescribed Percoset, Toradol 30 mg, Aspirin 352 mg, and Plavix 75 mg.  (R. at 427-28).

On April 12, 2006, Dent received another chest x-ray because she was experiencing shortness of breath.  (R. at 495).  Her lungs were clear and her heart size, vascularity, and mediastinum were

normal.  (Id.).

Dent went to the emergency room on May 23, 2006, because she was experiencing coughing, chest pain, and sinus congestion.  (R. at 496, 498).  Dent rated her pain level as being seven out of ten.  (R. at 198).  A chest x-ray showed that Dent's cardiac silhouette was enlarged, and vascular congestion was present with mild intertitial edema.  (R. at 496).  Her lungs were clear.  (Id.).  Dent was prescribed Zithromax, Mucinex, and Percoset.  (R. at 501).  Blood work showed that Dent's red blood cell, hemoglobin, and hematocrit counts were low, and her red cell distribution width was high.  (R. at 493).

On August 1, 2006, Dr. Stefan J. Cowles performed a CT of the paranasal sinus.  (R. at 527).  It showed that Dent had refractory sinusitis and rhinitis.  (Id.).  He stated that there was minimum mucosal apposition at the left osteomeatal complex without associated acute sinusitis.  (Id.).  Additionally, he noted that a left maxillary mucous retention cyst was present.  (Id.).  Otherwise, the CT was negative.  (Id.).

On August 30, 2006, a chest x-ray showed that Dent's chest was normal, and a cervical spine x-ray showed no abnormalities.  (R. at 513).  Dent claimed that she was experiencing dysphagia, so an x-ray modified barium swallow was also conducted.  (R. at 514).  It revealed normal swallowing with no evidence of aspiration.  (Id.).

On October 6, 2006, Dr. John M. Witherington took x-rays of

Dent's abdomen and chest to assess her abdominal and chest pain. (R. at 406). Her chest x-ray showed cardiac enlargement, and marked obesity was evident with underpenetration of the left lung base. (Id.). Otherwise, Dent's lungs were normal. (Id.). There was no abnormal gas pattern or calcification identified. (Id.). His diagnostic impression was marked obesity with otherwise normal abdomen and chest. (Id.).

In July of 2005, Dent was admitted to the Methodist LeBonheur Healthcare Emergency Department for pain and swelling in her right eye. (R. at 528-37). At discharge, Dent was diagnosed with a corneal abrasion, given antibiotics, and instructed to wear an eye patch and follow up with an ophthalmologist. (R. at 528). She was also given a Work Release Form stating that she could return to work on August 2, 2005, with no restrictions. (R. at 532). Dent's ophthalmology follow up examinations revealed a healed cornea. (R. at 538-41).

Between March 30 and November 12, 2004, Dent sought treatment from Dr. Harris for swelling in her right foot, hoarseness, earaches, shortness of breath, chest pain, pain in her legs, hand, back, and neck, body aches, chest congestion, and a swollen leg and knee. (R. at 278, 280, 284, 286, 315). Blood work done on October 19 and 27, 2005, revealed that her white blood cell count was high, and her CD4/CD8 ratio was low. (R. at 321-24).

On December 27, 2005, Dr. Harris wrote the following letter

for purposes of Dent's social security benefits claim:

> Please be advised that Ms. Nora Dent is a patient of
> Metro Memphis Medical Specialists, Inc. Due to the
> multiplicity and complexity of her medical conditions,
> Ms. Dent has been hospitalized on several occasions. Her
> medical condition includes on-going morbid obesity and
> respiratory problems that requires [sic] continuous
> monitoring with medical follow-up and extensive
> medications. As a result, the patient [sic] overall
> functional capacity has been significantly compromised.

(R. at 466).

Additionally, from October 19, 2005, until September 6, 2006,
Dent was treated by Dr. Harris for gastroesophageal reflux disease,
epigastric pain, insomnia, chest pain, coughing, earaches, a rash
on her arms and legs, congestion, severe abdominal pain, headaches,
general body pain, knee and hand pain, hoarseness, sore throat,
runny eyes, sinus problems, leg pain, and breathing problems. (R.
at 312, 314, 454-55, 518-21, 525-26).

Dent was also treated by Dr. Idah Cannon from January until
October of 2005. (R. at 458-64). She was treated for congestion,
earache, loss of voice, knee pain, possible diabetes, dizziness,
body aches, hoarseness, abdominal pain, leg pain, and headaches,
and was seen at various follow-up appointments for medication
refills. (R. at 269-77, 458-64).

Dent was referred to AM Diabetes Center for testing to
determine whether she had diabetes. (R. at 484). On July 5, 2005,
Dent complained of blurred vision, polyuria and polydipsia, but her
blood glucose level was normal. (R. at 306). Dent was

experiencing decreased energy, occasional spontaneous sweating, excessive thirst and urination, arthritis, but otherwise her systems were normal. (R. at 307). Her physical examination was normal. (R. at 308). On July 18, 2005, Dent complained of thirst, leg and knee pain, polyuria and polydipsia, swelling in her feet, and headaches. (R. at 302). She also claimed to be drinking twenty to twenty-five pitchers of water a day. (Id.). A comprehensive metabolic panel yielded normal results, although Dent's triglycerides and cholesterol were high. (R. at 484-85). Dent was not diagnosed with diabetes.

## B.  Residual Functional Capacity Assessments and Vocational Assessment

Dr. Saul Juliao, a Tennessee Disability Determination Services examiner, conducted a Physical Residual Functional Capacity ("RFC") Assessment on Dent on September 28, 2004. (R. at 113-20). He found that Dent could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds. (R. at 114). Additionally, she could stand and/or walk for about six hours in an eight-hour workday and sit for about six hours in an eight-hour workday. (Id.). He also found that Dent's ability to push and/or pull was unlimited. (Id.). Dr. Juliao found that Dent could occasionally climb a ramp or stairs and never climb a ladder, rope, or scaffolds. (R. at 115). He also found that she could occasionally balance, stoop, kneel, crouch, or crawl. (Id.). He did not find that Dent had any manipulative, visual, or

communicative limitations. (R. at 116-17). He found that she should avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, fumes, odors, dusts, gases, and poor ventilation, as well as hazards. (R. at 117). He found that Dent was unlimited in activities around noise and vibration. (Id.). Dr. Juliao based his findings on Dent's HIV, congestive heart failure, carpal tunnel syndrome, hepatitis C, osteoarthritis, and obesity. (R. at 114). He stated that her physical impairments were based on the combined effect of multiple conditions as well as her pain and fatigue. (R. at 115). He also noted that Dent's allegations of pain and fatigue were partially credible. (Id.).

On March 1, 2005, Robert Butler of the Tennessee Department of Human Services completed a Vocational Assessment on Dent. (R. at 101). He stated that Dent was capable of performing her past relevant occupation as an admissions clerk as Dent described it. (Id.).

Dr. Cannon, Dent's treating physician, completed a Physical RFC Questionnaire on Dent on April 22, 2005. (R. at 267-68). Dr. Cannon found that Dent could not work an eight-hour day for five days per week and that Dent's impairments would result in significant absences from work. (R. at 267). She found that Dent suffered from moderate to severe pain and that her pain medication caused dizziness and drowsiness. (Id.). Dr. Cannon found that degenerative joint disease in Dent's hands and wrists limited Dent

-17-

to lifting or carrying a maximum of ten pounds and would affect Dent's use of her hands and ability to finger objects. (Id.). Additionally, Dr. Cannon found that degenerative arthritis in Dent's hips and morbid obesity affected Dent's ability to stand and walk, caused her to use a cane or brace, and limited Dent to standing and/or walking for one hour total, and half an hour without interruption, during an eight-hour day. (Id.). Dr. Cannon found that Dent's ability to sit was not affected by her impairments. (Id.).

Dr. Cannon also found that Dent did not need to elevate her feet or legs while sitting and that Dent suffered from extreme fatigue. (R. at 268). Additionally, she found that Dent's ability to reach, push, and pull were moderately affected by her impairments, but her ability to feel and hear were not. (Id.). Dent was also unlimited in her activity around chemicals, dust, noise, fumes, or vibration, but she was limited in her activity around temperature extremes and humidity. (Id.). Dr. Cannon found that Dent's impairments precluded her from driving, working around heights and machinery, and balancing. (Id.). Finally, she found that Dent's vision, hearing, and speaking were not affected by her impairments. (Id.).

## C.  Psychological Evaluations

Tennessee Disability Determination Services examiner Dr. L.D. Hutt evaluated Dent on December 28, 2004. (R. at 121-24). Dr.

Hutt found that Dent was neat, clean, dressed appropriately, and her gait was slow and lumbering due to her obesity. (R. at 121). Her posture was within normal limits and she displayed no unusual habits or mannerisms. (Id.). Dr. Hutt considered Dent to be a reliable historian and found that she put forth good effort during the evaluation. (Id.). Therefore, Dr. Hutt considered the results of the examination to be accurate reflections of Dent's mental and emotional status. (Id.).

Dent's chief complaints were arthritis, HIV infection, congestive heart failure, shortness of breath, and hepatitis C. (Id.). Dent did not complain of any mental, emotional, or behavioral problems, and she was not in any apparent distress. (Id.). Dent stated that she had been treated on an outpatient basis for depression with Celexa in 1998, but she denied any mental or emotional difficulties since then. (R. at 122). Dent denied any history of alcohol or drug use. (Id.).

Dent stated that she went to bed at 12:30 a.m. and got up at 7:00 a.m., and she indicated that her sleep was disrupted by frequent trips to the bathroom. (R. at 122). Dent bathed, dressed, and groomed herself, and she made her bed, prepared meals, and used the stove and microwave. (Id.). Dent claimed that she was unable to dust, vacuum, do laundry, sweep, mop, or walk due to her inability to stand for more than one minute. (Id.). She stated that she got along fairly well with her family, but her

social activities were highly restricted due to her obesity and her inability to walk or stand for more than a minute. (R. at 122-23). Dr. Hutt found that Dent's activities of daily living reflected no impairments due to mental or emotional factors in appropriateness, effectiveness, independence, or sustainability. (R. at 123).

Dr. Hutt found Dent to be alert, responsive, oriented, and in good touch with her surroundings, but her psychomotor activity was low due to her obesity. (R. at 123). Dent's stream of mental activity and affect were normal. (<u>Id.</u>). Dent denied any signs or symptoms of a major mental or emotional disorder. (<u>Id.</u>). Dr. Hutt estimated that Dent's mental ability was bright average. (<u>Id.</u>). He did not find that she met any mental health diagnoses. (<u>Id.</u>). He assigned her a Global Assessment of Functioning ("GAF")[2] score

---

[2]GAF ratings are subjective determinations based on a scale of 1 to 100 of "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual Mental of Mental Disorders (4th ed. 2000) at 32 ("DSM-IV Manual"). Each range can be described as follows: a GAF score in the range of 1-10 indicates "persistent danger of severely hurting self or others OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death;" a GAF score in the range of 11-20 indicates "some danger of hurting self or others OR occasionally fails to maintain minimal personal hygiene OR gross impairment in communication;" a GAF score in the range of 21-30 indicates "considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment OR inability to function in almost all areas;" a GAF score in the range 31-40 indicates "some impairment in reality testing or communication OR major impairment in several areas such as work, school, family relations, judgment, thinking or mood;" a GAF score in the range of 41-50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" a GAF

of eighty-five from a mental and emotional standpoint.  (Id.).  Dr. Hutt found that Dent had no impairment-related mental limitations and that she had the intelligence, judgment, and educational competency to manage funds independently.  (R. at 123-24).

Dr. Frank D. Kuptas completed a Psychiatric Review on Dent on February 28, 2005.  (R. at 125-38).  He found no medically determinable impairments.  (R. at 125).  He also found that Dent's activities of daily living included personal hygiene, light household chores, cooking, childcare, budgeting, attending church two times a week, reading, watching television, and playing cards. (R. at 137).  He stated that Dent presented with physical problems and morbid obesity that may limit her activities, but that she had not had psychiatric treatment.  (Id.).  He also stated that Dent was able to perform all of her daily activities independently, and

---

score in the range of 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers);" a GAF score in the range of 61-70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational or school functioning (e.g., occasional truancy or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships;" a GAF score in the range of 71-80 indicates "if symptoms are present, they are transient and an expectable reaction psychosocial stressors (e.g., difficulty concentrating after family argument; no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork));" a GAF score in the range of 81-90 indicates "absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns." Id. at 34.

her limitations appeared to be primarily due to her physical condition. (Id.).

Disability examiner Margarett Faircloth completed a Development Summary Worksheet on July 27, 2005. (R. at 292). She stated that Dent had alleged worsening knee arthritis, but that charts and examinations through July 5, 2005, did not show objective signs of worsening of previously assessed conditions including obesity. (Id.). Dent's cardiac catheter and echocardiogram tests were normal. (Id.). Additionally, Faircloth believed that Dr. Cannon's RFC assessment was overly restrictive based on the objective findings. (Id.). Faircloth affirmed and adopted Dr. Juliao's RFC determination. (Id.). She also affirmed and adopted the Psychiatric Review of Dr. Hutt and the vocational assessment completed on March 1, 2005. (Id.).

**D.   Dent's Allegations of Disability**

In her Disability Report, Dent claimed that she is suffering from congestive heart failure, carpal tunnel syndrome, and HIV infection, and she alleged a disability onset date of April 1, 2004. (R. at 63). She stated that her conditions limit her ability to work because she cannot walk due to shortness of breath, swelling in her feet, and pain in her legs and back. (Id.). Dent last worked full-time as a hospital admissions clerk from November of 2002 until January of 2004. (Id.). Dent completed one year of college in 1990, and she completed vocational training as a medical

office specialist in May of 2002.  (R. at 67).

In a Pain Questionnaire, Dent stated that she experiences swollen feet, as well as chest, hand, and back pain that spreads over her entire body.  (R. at 72).  She stated that the pain is constant, may last all day, and is brought on by walking, standing, and using her hands.  (Id.).  She also stated that her pain medication caused her to sleep a lot, and it only relieved her pain until she woke up.  (Id.).  Dent stated that she used support hose and hand splints to relieve her pain as well as hot baths and therapeutic massages.  (R. at 73).  She stated that the pain began to affect her activities about four years ago and that she could no longer walk, stand up, or comb her hair.  (Id.).  She further claimed that she spent most of her day in bed with her feet elevated.  (Id.).

Dent's work history report stated that as an admissions clerk, she did a lot of typing and operated phones and office equipment.  (R. at 77).  Additionally, the job required her to walk for seven hours, stand for two hours, sit for two hours, crouch for seven hours, handle, grab, or grasp large objects for seven hours, reach for seven hours, and write, type or handle small objects for eight hours in an eight-hour day.  (Id.).  She also stated that she was required to lift and carry medical charts and boxes of supplies.  (Id.).

**E.   Disability Determinations**

Robert Butler, a disability examiner, and Dr. Juliao completed Dent's Disability Determination on March 18, 2005. (R. at 37-38). They found that Dent had a primary diagnosis of chronic heart failure, and that the medical evidence was insufficient to establish a secondary diagnosis. (R. at 37). They also found that although Dent had hand pain, she could stand, move about, and use her arms, hands, and legs in a satisfactory manner. (R. at 38). Additionally, they found that her congestive heart failure was not totally disabling and that there were no complications from her HIV. (Id.). They also found that her psychiatric evaluation did not show an impairment from depression. Finally, they determined that her condition was not severe enough to keep her from working and that she could perform her past work as a hospital admissions clerk as she described it. (Id.).

Disability examiners Faircloth and Dr. Joe G. Allison also performed a disability determination on July 27, 2005. (R. at 39, 53). They came to substantially the same conclusions as Butler and Dr. Juliao, and concurred with the March 18, 2005, determination. (Id.). Additionally, Faircloth and Dr. Allison found that Dent's heart beat and function were satisfactory for many normal activities and that although Dent experienced osteoarthritis pain, she could stand, move about, and use her arms, hands, and legs in a satisfactory manner. (R. at 53). They also found that Dent did not have any complications due to her headaches or fatigue that

would be disabling.  (Id.).

**F.  Administrative Hearing**

Dent appeared at a hearing before ALJ Fava in Memphis,
Tennessee, on April 3, 2006.  (R. at 560-76).  She was represented
by attorney John Canale.  (R. at 560).  Dent testified that she had
last worked two years ago as an admissions clerk.  (R. at 565).
She stated that she was terminated because she was allegedly
insubordinate to a security guard in disregarding a response to a
call.  (Id.).  She stated that there was a shortage in the radio
that caused her to miss the call, and "the CEO of the company wrote
. . . a statement showing that it wasn't my fault and because he
had been there longer they just said they would just dismiss me as
being just charged no longer in need of my services instead of
insubordination."  (R. at 565-66).  Dent testified that the company
would not hire her back because she "wasn't their type of
material."  (R. at 566).  She also testified that she looked for
another job as a medical office secretary for about one year after
being terminated but that no one would call her due to her
termination at her previous job.  (R. at 566-67).  Additionally,
she stated that her health started deteriorating and she started
gaining weight from being depressed during that period.  (R. at
566).

Dent testified that she would no longer be physically able to
return to work as a medical secretary due to her carpal tunnel

because the job required her to use her hands frequently to type on a computer keyboard. (R. at 566, 568). She further stated that she had difficulty picking up and holding anything that weighed more than ten pounds because it hurt the muscles in her wrists. (Id.). She stated that she had undergone operations on both of her hands about five years ago. (Id.). Dent testified that Dr. Harris had been treating her carpal tunnel syndrome on an ongoing basis. (Id.). She said that the pain had been intermittent, but that lately it had been "really excruciating pain" in her hands and she was not able to do anything about it. (Id.). Dent also testified that she could not work as a medical secretary because she could not sit for prolonged amounts of time, as her feet would swell due to fluid around her heart. (R. at 569).

Dent testified that since she stopped working, she had been living on government assistance in the amount of $185.00 per month, child support in the amount of $150.00 per month, and food stamps in the amount of $339.00 per month. (R. at 567). She stated that she also received help from her family so that she could have enough to live on. (Id.).

Dent stated that she had been hospitalized during the past year for congestive heart failure. (R. at 569). She said that it had not been resolved and she was still receiving treatment and medication from Dr. Harris. (Id.). She stated that Dr. Harris had been treating her for over five years and that she saw him almost

every month.  (R. at 569, 572).  Dent also stated that she had seen Dr. Cannon for about six months.  (R. at 570).  She stated that Dr. Harris had restricted her from prolonged sitting and standing. (Id.).

Dent testified that she spent a typical day laying in bed most of the time.  (R. at 571).  She said that if she sat up for an hour her feet would swell, so she spent most of the day lying flat in her bed.  (Id.).  She also stated that her daughter did all of the cooking and cleaning.  (R. at 571-72).  She testified that she no longer drove because it hurt to grip the steering wheel, and she had gotten too big to fit in the front seat.  (R. at 572).  Dent stated that Dr. Harris was trying to get her into a weight loss program, but that she had been on the waiting list for two years because she had not been able to pay for it.  (Id.).  She also stated that she received TennCare and was still trying to get authorization for the weight loss program.  (Id.).

Dr. Harris' letter of December 27, 2005, stating that Dent's overall functional capacity had been significantly compromised, was provided to the ALJ during the hearing.  (R. at 573-74).  The ALJ requested that Dent's attorney obtain a statement or an RFC determination from Dr. Harris addressing whether Dent could perform sedentary work.  (R. at 574).  An RFC determination from Dr. Harris, however, was not provided to the ALJ.

**G.   The ALJ's Decision**

The ALJ issued his decision denying Dent's claims on August 24, 2006. (R. at 11-26). Applying the five-step sequential disability analysis,[3] the ALJ found at steps one and two that Dent had not engaged in substantial gainful activity since the alleged onset of the disability and that Dent's HIV infection, obesity, congestive heart failure, and sleep apnea were severe impairments based on the requirements of the regulations. 20 C.F.R. § 404.1520(c); (R. at 16). At step three, the ALJ determined that Dent's medically determinable impairments did not meet or medically equal, either singly or in combination, any of the listed impairments in Appendix 1, Subpart P, Regulations No. 4 (the "Listings"). (R. at 17).

At step four, the ALJ had to determine Dent's RFC to perform her past relevant work or other work existing in significant

---

[3]Entitlement to Social Security disability benefits is determined by a five-step sequential analysis set forth in the Social Security Regulations. 20 C.F.R. §§ 404.1520, 416.920. First, the claimant must not be engaged in substantial gainful activity for a period of not less than twelve months. 20 C.F.R. § 404.1520(c). Second, a finding must be made that the claimant suffers from a severe impairment. Id. Third, the ALJ must determine whether the impairment meets or equals the severity criteria set forth in the Listing of Impairments contained in the Social Security Regulations. 20 C.F.R. §§ 404.1520(d), 404.1525, 505.1526. If the claimant's impairment does not meet or equal a listed impairment, the ALJ must undertake the fourth step in the analysis and determine whether the claimant has the residual functional capacity to return to any past relevant work. 20 C.F.R. § 404.1520(e). If the ALJ finds the claimant unable to perform past relevant work, then, at the fifth step, the ALJ must determine whether the claimant can perform other work which exists in significant numbers in the national economy. 20 C.F.R. § 404.1520(f).

numbers in the national economy. (R. at 19). The ALJ opined that
Dent retained the RFC to perform her past work as a medical
secretary. (R. at 22). He determined that Dent could occasionally
lift and carry twenty pounds, frequently lift and carry ten pounds,
stand and walk for six hours in an eight-hour workday, and sit for
six hours in an eight-hour workday. (R. at 19). Additionally, he
found no limitations in Dent's ability to push and pull. (Id.).
In making this determination, the ALJ stated that he considered all
of Dent's symptoms and the extent to which the symptoms could
reasonably be accepted as consistent with the objective medical and
other evidence. 20 C.F.R. § 416.929; (R. at 20). He also
considered the opinion evidence of record. 20 C.F.R. § 416.927;
(R. at 20).

The ALJ concluded that although Dent's medically determinable
impairments could reasonably be expected to produce her alleged
symptoms, her statements concerning the intensity, persistence, and
limiting effects of her symptoms were not entirely credible. (R.
at 20). The ALJ noted that at her hearing, Dent stated that she
had been fired from her last job due to insubordination and that
she could not get a job because of the insubordination incident,
and thus, the reasons for her termination and inability to find
work were unrelated to her impairments. (R. at 22).

The ALJ also stated that Dent's reported activities of daily
living were in line with the exertional requirements of her job as

a medical secretary, which was defined as a sedentary occupation in the Dictionary of Occupational Titles ("DOT"). See Dictionary of Occupational Titles 201.362-014 (1991), available at 1991 WL 688174; (R. at 22). He noted that Dent got up in the morning, made sure her daughter got up and went to school, and lied back down to talk on the phone. (R. at 22). She could do her shopping with the aid of a Hoveround, and she attended church. (Id.). Additionally, Dent said that she played cards, read, watched movies, listened to the radio, and watched, played with, and talked to her granddaughter. (R. at 22-23). The ALJ noted that Dent's claim that depression kept her from working and socializing was not credible because the record showed that she had not been treated for depression, and she had stated that she enjoyed socializing and attended church regularly. (R. at 23). Morever, the ALJ found that Dent's claim that she had debilitating respiratory and heart problems was not credible because the medical records showed that her test results were largely normal and negative for chest or heart problems. (Id.). The ALJ found that although Dent complained of sleep apnea, she was able to sleep with her Continuous Positive Airway Pressure ("CPAP") machine. (Id.). Additionally, her shortness of breath was relieved by resting. (Id.).

Dent also alleged having diabetes and hypertension, but the ALJ found that the record did not support such impairments. (R. at

23-24). Although Dent had been diagnosed with HIV, the ALJ found that the record showed that her CD4 ratios had steadily improved, and she had no HIV-related complications. (R. at 24). The ALJ found that Dent had been advised by her doctors that many of her physical problems were caused by her morbid obesity. (Id.). He also found that she had been put on weight management but had not been compliant with her doctors' advice. (Id.). The ALJ stated that under 20 C.F.R. §§ 404.1530 and 416.930, a claimant must follow treatment prescribed by her physician if the treatment can restore her ability to work, and, if the claimant does not follow the prescribed treatment without a good reason, the claimant will be found to be not disabled. (Id.). Further, the ALJ found that the record did not show that Dent had any obesity-related complications that would produce disabling functional limitations. (Id.).

The ALJ also opined that Dent's report of her symptoms and limitations was not credible. He stated that

> The claimant receives $185 per month government assistance, $150 per month child support, $399 per month in food stamps, and her daughter, who lives with her, works and receives assistance for her child. This would suggest that the claimant is perhaps unmotivated to work because her needs are being met without doing so. It would appear that she has consciously attempted to portray limitations that are not actually present in order to increase the chances of obtaining benefits.

(R. at 24).

In considering the medical evidence, the ALJ assigned little

weight to Dr. Cannon's RFC assessment because Dr. Cannon had only seen Dent for a few visits and because the limitations she imposed were overly restrictive and not supported by the objective medical evidence. (R. at 24). The ALJ found that Dr. Cannon's RFC assessment was probably based on Dent's subjective complaints rather than objective clinical findings. (R. at 25). The ALJ found that Dr. Harris' letter stating that Dent's overall functional capacity had been significantly compromised could not be given much weight because it was not supported by medical evidence and did not include any specific conclusions. (Id.). The ALJ also concluded that a "negative inference must be drawn from [Dr. Harris'] failure to submit a residual functional capacity assessment." (Id.). Although Dr. George did not provide a physical assessment, the ALJ found that his records indicated that Dent experienced steady improvement during his treatment. (Id.).

The ALJ gave greater weight to the state agency medical consultants' RFC assessments. (R. at 25). He found that although they did not examine Dent, they thoroughly reviewed the record and provided specific reasons for their opinions about her RFC. (Id.). Additionally, he found that evidence received into the record after the reconsideration determination did not provide new or material information that would alter their opinions. (Id.). The ALJ also found that the state agency consultants' opinions were supported by Dr. Hutt's findings of no impairment-related limitations. (Id.).

Finally, at step five, the ALJ opined that Dent was capable of performing her past relevant work as a hospital admissions clerk, as that job is defined in the <u>DOT</u>. <u>Dictionary of Occupational Titles</u> 201.362-014 (1991), <u>available at</u> 1991 WL 671668; (R. at 25-26). He found that Dent could perform that work as it is actually and generally performed. (R. at 26). The ALJ concluded that Dent was not disabled. (<u>Id.</u>).

## II. PROPOSED CONCLUSIONS OF LAW

In her appeal, Dent contends that the ALJ's decision was not supported by substantial evidence and that the ALJ committed errors of law and applied improper or incorrect legal standards. Specifically, Dent argues that the ALJ erred in failing to determine that her degenerative joint disease and carpal tunnel syndrome constituted severe impairments; to consider the effects of Dent's pain from degenerative joint disease and headaches; to consider the effects of the conditions that he found to be severe; to give proper weight to the findings of her treating physicians as compared to the assessments of the state agency consultative doctors, and by failing to adopt all of the limitations recommended by Dr. Juliao; and to consider the effects of Dent's frequent absences from work and need for frequent bathroom breaks. Dent also argues that the ALJ was biased, that his decision was based on speculation about Dent's motivation to work, and that he erred by drawing a negative inference from Dent's inability to provide him

with an RFC assessment from Dr. Harris after the hearing.

## A.    Standard of Review

Judicial review of the Commissioner's decision is limited to whether there is substantial evidence to support the decision, 42 U.S.C. § 405(g); Drummond v. Comm'r of Soc. Sec., 126 F.3d 837, 840 (6th Cir. 1997), and whether the correct legal standards were applied. Landsaw v. Sec'y of Health & Human Servs., 803 F.2d 211, 213 (6th Cir. 1986). When the record contains substantial evidence to support the Commissioner's decision, the decision must be affirmed. Stanley v. Sec'y of Health & Human Servs., 39 F.3d 115, 117 (6th Cir. 1994) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401 (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

In determining whether substantial evidence exists, the reviewing court must examine the evidence in the record taken as a whole and must take into account whatever in the record fairly detracts from its weight. Abbott v. Sullivan, 905 F.2d 918, 923 (6th Cir. 1990). Judicial review must be based on the record as a whole, and the district court may look to any evidence in the record regardless of whether it has been cited by the ALJ. Heston v. Comm'r of Soc. Sec., 245 F.3d 528, 535 (6th Cir. 2001). When substantial evidence supports the Commissioner's determination, it

is conclusive, even if substantial evidence also supports the opposite conclusion.  <u>Felisky v. Bowen</u>, 35 F.3d 1027, 1035 (6th Cir. 1994).  Similarly, the court may not try the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility.  <u>Cutlip v. Sec'y of Health & Human Servs.</u>, 25 F.3d 284, 286 (6th Cir. 1994).

**B.  Degenerative Joint Disease And Carpal Tunnel Syndrome.**

Dent argues that the ALJ's determination that her degenerative joint disease[4] and carpal tunnel syndrome were not severe impairments is not supported by substantial evidence.  "A severe impairment . . . is one which significantly limits the physical or mental ability to perform basic work activities."  <u>Bone v. Apfel</u>, No. C2-99-315, 2000 WL 1505030, at *5 (S.D. Ohio Sept. 29, 2000); 20 C.F.R. § 404.1520(c).  Basic work activities are "the abilities and aptitudes necessary to do most jobs," including "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling."  20 C.F.R. § 404.1521(b).  The "severe impairment requirement is a threshold element [that] plaintiff must prove in order to establish disability within the meaning of the Act."  <u>Bone</u>, 2000 WL 1505939, at *5.  An impairment is not severe "only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the

---

[4]Degenerative joint disease is another term for osteoarthritis. <u>See</u> Medline Plus, http://www.nlm.nih.gov/medlineplus/ency/article/000423.htm.

individual's ability to work, irrespective of age, education and work experience." Salmi v. Sec'y of Health & Human Servs., 774 F.2d 685, 691 (6th Cir. 1985). Any doubt regarding whether an impairment is severe should be resolved in favor of continuing the sequential evaluation process beyond step two so that vocational factors are taken into account. Bone, 2000 WL 1505939, at *5 (citing SSR 85-28).

Although the Commissioner is correct in his argument that Dent did not specifically list degenerative joint disease or osteoarthritis in her disability report as an illness or condition that limited her ability to work, she did indicate in the report that she was limited in her ability to work due to "feet swell and pain in legs and back." (R. at 63). Also, as the ALJ noted in his decision, "[t]he claimant alleged in hearing testimony that due to her . . . carpal tunnel syndrome . . . and osteoarthritis she can no longer work." (R. at 20). Thus, at the time of the hearing, the ALJ was aware that Dent believed her carpal tunnel syndrome and degenerative joint disease/osteoarthritis were impairments that limited her ability to work.

It is unclear from the record, however, why and on what basis the ALJ believed that degenerative joint disease/osteoarthritis and carpal tunnel syndrome did not qualify as severe impairments. While the ALJ need not discuss every aspect of the record or explain every finding at length, the ALJ must "articulate with

specificity reasons for the findings and conclusions that he or she makes" to facilitate meaningful judicial review. Spence v. Astrue, No. 1:06-cv-217, 2008 WL 444663, at *1 (E.D. Tenn. Feb. 15, 2008) (citing Bailey v. Comm'r of Soc. Sec., 1999 WL 96920, at *4 (6th Cir. Feb. 2, 1999)). Here, the ALJ did not address degenerative joint disease/osteoarthritis or carpal tunnel syndrome under step two of the sequential analysis, and consequently, there was no discussion of whether these impairments meet or medically equal the criteria of an impairment in the Listings under step three.

Although the ALJ briefly mentioned degenerative joint disease on page eleven of his opinion, (R. at 24), this discussion appeared as part of the ALJ's analysis under step four (as opposed to step two) of the sequential analysis. Moreover, in this part of the ALJ's decision, the ALJ decided to give minimal evidentiary weight to the opinion of Dr. Cannon, one of Dent's treating physicians, because "Dr. Cannon's opinion is unsupported by medical evidence and inconsistent with the record as a whole[.]"  (R. at 24-25). It is submitted, however, that the ALJ failed to identify with sufficient specificity the portions of the record that support his decision to discount Dr. Cannon's opinion so as to enable this court to conduct meaningful judicial review.  If a treating or examining physician's opinion is rejected by the ALJ, then the ALJ must present some basis for rejecting it.  Shelman v. Heckler, 821 F.2d 316, 321 (6th Cir. 1987).  Generally, "[t]he medical opinion

of a treating physician is to be given substantial deference."
Walker v. Health & Human Servs., 985 F.2d 1066, 1070 (6th Cir.
1992); see also 20 C.F.R. § 404.1527(d)(2).[5]  The court, however,
"is not bound by a treating physician's conclusory statement."
Duncan v. Sec'y of Health & Human Serv., 801 F.2d 847, 855 (6th
Cir. 1986).  A treating physician's opinion receives controlling
weight only when it is supported by sufficient clinical findings
and is consistent with the evidence, see 20 C.F.R. §
404.1527(d)(2); Cutlip, 25 F.3d at 287, and lack of "detailed,
clinical, diagnostic evidence" can render a treating physician's
opinion less creditworthy.  Walters v. Comm'r of Soc. Sec., 127

---

[5]20 C.F.R. § 404.1527(d)(2) provides as follows:

> Generally, we give more weight to opinions from your
> treating sources, since these sources are likely to be
> the medical professionals most able to provide a
> detailed, longitudinal picture of your medical
> impairment(s) and may bring a unique perspective to the
> medical evidence that cannot be obtained from the
> objective medical findings alone or from reports of
> individual examinations, such as consultative
> examinations or brief hospitalizations.  If we find that
> a treating source's opinion on the issue(s) of the nature
> and severity of your impairment(s) is well-supported by
> medically acceptable clinical and laboratory diagnostic
> techniques and is not inconsistent with the other
> substantial evidence in your case record, we will give it
> controlling weight.  When we do not give the treating
> source's opinion controlling weight, we apply the factors
> listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this
> section, as well as the factors in paragraphs (d)(3)
> through (d)(6) of this section in determining the weight
> to give the opinion.  We will always give good reasons in
> our notice of determination or decision for the weight we
> give your treating source's opinion.

F.3d 525, 530 (6th Cir. 1997).  Although the ALJ is not bound by a treating physician's opinion, "he must set forth the reasons for rejecting the opinion in his decision."  <u>Culbertson v. Barnhart</u>, 214 F. Supp. 2d 788, 797 (N.D. Ohio 2002) (citing <u>Shelman</u>, 821 F.2d at 321).

In this case, it is submitted that the ALJ did not describe with sufficient specificity his reasons for rejecting the opinion of Dr. Cannon and giving greater weight to the opinions of the state agency consultative doctors.  Therefore, it is recommended that the case be remanded for further proceedings in order for the ALJ to make further findings regarding Dent's degenerative joint disease/osteoarthritis and carpal tunnel syndrome, and further findings regarding his basis for the weight given to Dr. Cannon's and the state agency consultative doctors' opinions, and in particular their RFC assessments.

## C. Effects Of Dent's Pain From Degenerative Joint Disease And Headaches.

Dent next argues that the ALJ improperly failed to consider the effects of her pain from degenerative joint disease and headaches.  Specifically, she argues that the ALJ did not discuss or apply the Sixth Circuit's guidelines for analyzing subjective complaints of pain as articulated in <u>Duncan v. Sec'y of Health & Human Servs.</u>, 801 F.2d 847 (6th Cir. 1986) and <u>Felisky v. Bowen</u>, 35 F.3d 1027 (6th Cir. 1994):

First, we examine whether there is objective medical

evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

Duncan, 801 F.2d at 853. Even if objective medical evidence does not support the alleged severity of the pain, the regulations require the ALJ to consider the claimant's subjective complaints of pain, which includes consideration of

(i) Your daily activities;

(ii) The location, duration, frequency, and intensity of your pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 416.929(c)(3); Felisky, 35 F.3d at 1039-40.

It is submitted that the ALJ failed to properly address Dent's allegations of pain under Felisky and 20 C.F.R. § 416.929(c)(3). Although the ALJ mentions 20 C.F.R. § 416.929 generally, (R. at 20), the opinion contains no discussion of the test articulated in

<u>Felisky</u>, nor does the opinion address the factors set forth under the regulations. Therefore, it is submitted that the ALJ must analyze Dent's pain as required by <u>Felisky</u> and 20 C.F.R. § 416.929(c)(3) on remand.

**D. Effects Of Dent's Severe Impairments.**

Dent next argues that the ALJ erred in failing to consider the functional effects of her severe impairments, specifically, drowsiness due to sleep apnea and nausea and susceptibility to opportunistic infections due to HIV. The ALJ did consider Dent's sleep apnea and HIV and their effects in his determination of her RFC. (R. at 20). The ALJ found that Dent's sleep apnea was controlled with a CPAP machine, her shortness of breath during the day was alleviated on resting, and that there was no medical evidence from a treating source of any additional acute respiratory problems or treatment. (R. at 23, 94). Additionally, as the ALJ noted, Dr. George's records showed that Dent's HIV was well-controlled and responding to treatment. (R. at 212). On February 3, 2004, Dr. George wrote a letter to Dr. Harris stating that Dent's CD4 count had increased from fifty-four to 258, and her HIV viral load was undetectable. (<u>Id.</u>). The record also showed that Dent was not suffering from any opportunistic infections, and her hepatitis C infection had cleared. (<u>Id.</u>). Therefore, the court submits that the ALJ's RFC determination as it relates to the effects of Dent's sleep apnea and HIV is supported by substantial

evidence.

**E.  The ALJ's Reliance On Dr. Juliao's RFC Assessment.**

Dent argues that the ALJ erred in relying on the RFC assessment of a non-treating physician, Dr. Juliao, over the RFC assessment provided by Dr. Cannon.  As discussed earlier in this report and recommendation, on remand the ALJ will need to provide further specific findings regarding the weight given to Dr. Cannon's opinions, and in doing so, will need to provide further findings regarding the weight given to Dr. Juliao's RFC assessment. Until the ALJ makes these additional findings, it is premature at this time for the court to determine whether the ALJ must adopt any or all of the limitations recommended by Dr. Juliao.

**F.  Functional Limitations Caused By Frequent Work Absences And Frequent Bathroom Breaks.**

Dent also claims that her need for frequent work absences will impact her ability to work.  Dr. Cannon's RFC assessment stated that Dent's impairments would result in significant absences from work.  (R. at 267).  Moreover, the record shows frequent medical appointments and visits to the emergency room for treatment of Dent's various impairments.  The court submits that on remand, in connection with the ALJ's evaluation of Dr. Cannon's opinions and RFC assessment, the ALJ should address Dr. Cannon's opinion regarding Dent's frequent absenteeism and the impact it has on her ability to work, which may require taking testimony from a vocational expert.  See Connor v. Shalala, 900 F. Supp. 994, 1004

-42-

(N.D. Ill. 1995); <u>Kangas v. Bowen</u>, 823 F.2d 775, 778 (3rd Cir. 1987). The court submits, however, that Dent's claim that she needs to take frequent, unscheduled bathroom breaks is not supported by the record, and no medical source has found this to be a limitation of any manner.

**G.   Bias And Speculation.**

Dent contends that the ALJ improperly drew a negative inference based on Dent's inability to obtain an RFC assessment from Dr. Harris after the hearing. The court agrees that there are a number of reasons why a claimant may not be able to obtain an RFC assessment from a treating physician, and submits that the ALJ erred in drawing such an inference in this case.

Dent also argues that the ALJ erred in finding that she was unmotivated to work because her needs were being met through government assistance, child support, and her daughter's income. Under certain circumstances, an ALJ may judge credibility based on "a strong element of secondary gain." <u>Gaddis v. Chater</u>, 76 F.3d 893, 896 (8th Cir. 1996); <u>see also</u> <u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 590 (8th Cir. 2004) (the court found a strong element of secondary gain because the claimant had cancelled several physical therapy appointments and was receiving long-term disability in the amount of $1,700 per month). However, an ALJ "is required to be fair and impartial, and not prejudiced by a claimant's financial status (receipt of state benefits)." <u>Leggitt v. Sullivan</u>, 812 F.

Supp. 1109, 1120 (D. Colo. 1992) (citing <u>Caldwell v. Sullivan</u>, 738
F. Supp. 1076, 1081 (D. Kan. 1990)).  At the time of her hearing,
Dent was receiving only $674 per month from government assistance,
child support, and food stamps, combined.  When the ALJ asked Dent
if she was receiving enough money to live on, she stated that she
had to rely on her family for additional money.  Moreover, Dent
stated that she made $9.75 per hour as a hospital admissions clerk
and that she worked more than forty hours per week.  Thus, she was
making approximately $1,690 per month at that job, which was at
least $1,000 more than the amount of government assistance and
child support she was receiving on a monthly basis at the time of
the hearing.  Therefore, it is submitted that the ALJ erred in
discrediting Dent on these grounds.

Finally, Dent argues that the ALJ's decision should be
reversed because he was biased and that, on remand, the hearing
should be conducted by a different ALJ.  In support of this
argument, Dent cites to the ALJ's observation that Dent was
"perhaps unmotivated to work" and to the ALJ's various findings
that were adverse to Dent.

"[D]ue process requires that any hearing afforded [a Social
Security disability] claimant be full and fair."  <u>Ventura v.
Shalala</u>, 55 F.3d 900, 902 (3d Cir. 1995).  This standard is
violated where a claimant is deprived of the opportunity to present
evidence to an ALJ in support of his or her claim, or where the ALJ

exhibits bias or animus against the claimant.  Id. at 902-03.  The
presumption is that the hearing officer was unbiased, and "[i]t is
only after a petitioner has demonstrated that the decisionmaker
'displayed deep-seated and unequivocal antagonism that would render
fair judgment impossible' that the presumption is rebutted, the
findings set aside, and the matter remanded for a new hearing."
Keith v. Barnhart, 473 F.3d 782, 788 (7th Cir. 2007) (quoting
Liteky v. United States, 510 U.S. 540, 556 (1994)); see also Wells
v. Apfel, No. 99-5548, 2000 WL 1562845, at *5-6 (6th Cir. Oct. 12,
2000); Long v. Comm'r of Soc. Sec., 375 F. Supp. 2d 674, 677-78
(W.D. Tenn. 2005).

        "Bias cannot be inferred from a mere pattern of rulings by a
judicial officer, but requires evidence that the officer had it in
for the party for reasons unrelated to the officer's view of the
law . . . ."  Keith, 473 F.3d at 789 (quoting McLaughlin v. Union
Oil Co., 869 F.2d 1039, 1047 (7th Cir. 1989)); see also Marozsan v.
United States, 90 F.3d 1284, 1290 (7th Cir. 1996) ("judicial
rulings alone almost never constitute valid basis for a bias or
partiality motion").  Further, "judicial remarks during the course
of a trial that are critical or disapproving of, or even hostile
to, counsel, the parties, or their cases, ordinarily do not support
a bias or partiality challenge" unless "they reveal such a high
degree of favoritism or antagonism as to make fair judgment
impossible."  Liteky, 510 U.S. at 555; see also Bronson v.

Barnhart, 56 Fed. Appx. 793, 794 (9th Cir. 2003) (ALJ disqualified because the ALJ's hostility towards the claimant's counsel "was so severe and pervasive that it colored the entire hearing with bias," and the ALJ "accused counsel of being from 'outer space' or having just returned from her 'spaceship'"); Cooper v. Barnhart, 345 F. Supp. 2d 1309, 1311 (S.D. Ala. 2004) (ALJ disqualified for referring to claimant as a "junkie," a "little skinny twerp," a "[s]kinny little white guy," and an "ex-con" and for making insulting remarks about the claimant's family).

In this case, even assuming, *arguendo*, that Dent's bias claim has not been waived and is properly before this court,[6] see Wells, 2000 WL 1562845, at *6, it is submitted that Dent has not demonstrated bias on the part of the ALJ, as there is simply no

---

[6]The regulations provide that

> An administrative law judge shall not conduct a hearing if he or she is prejudiced or partial with respect to any party or has any interest in the matter pending for decision. If you object to the administrative law judge who will conduct the hearing, you must notify the administrative law judge at your earliest opportunity. The administrative law judge shall consider your objections and shall decide whether to proceed with the hearing or withdraw. If he or she withdraws, the Associate Commissioner for Hearings and Appeals, or his or her delegate, will appoint another administrative law judge to conduct the hearing. If the administrative law judge does not withdraw, you may, after the hearing, present your objections to the Appeals Council as reasons why the hearing decision should be revised or a new hearing held before another administrative law judge.

20 C.F.R. § 404.940.

evidence of bias by the ALJ, either during the hearing or in his written decision.  Thus, it is recommended that Dent's request to have a different ALJ preside over her hearing on remand be denied.

### III.   RECOMMENDATION

For the reasons above, the court recommends that the Commissioner's decision be remanded for further proceedings consistent with this report and recommendation.

Respectfully submitted,

s/ Tu M. Pham
_____
TU M. PHAM
United States Magistrate Judge


March 6, 2008
_____
Date


**NOTICE**

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN TEN (10) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C).  FAILURE TO FILE THEM WITHIN TEN (10) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**